# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

ROBERT BUTRIM,               :
                                      :
           Petitioner,           :       Civ. No. 14-4628 (RBK)
                                      :
         v.                        :
                                      :
STEPHEN D'ILIO, et al.,       :       **OPINION**
                                      :
           Respondent.         :
_____ :

**ROBERT B. KUGLER, U.S.D.J.**

## I.       INTRODUCTION

Petitioner, Robert Butrim, is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted by a jury of two counts of aggravated sexual assault, two counts of sexual assault and two counts of endangering the welfare of a child. He received a sentence of twenty-six years imprisonment. Petitioner raises several claims in his habeas petition. For the following reasons, the habeas petition will be denied.

## II.      FACTUAL AND PROCEDURAL BACKGROUND[1]

> Defendant was accused of sexually molesting his step-daughters, L.H. and T.H. (the girls or the twins). The State alleged that the crimes took place between 2000 and 2005, beginning when the girls were five years old. [FN 3] They reported the assaults when they were eleven years old. By the time the case came to trial in 2009, the girls were fourteen. The State's case rested on their testimony. There was no forensic evidence of the alleged sexual activity.

_____

[1] The factual background is taken from the Superior Court of New Jersey, Appellate Division opinion that decided petitioner's direct appeal that was merged with his appeal of his post-conviction relief ("PCR") denial. (*See* Dkt. No. 9-24)

The girls were the children of M.W.B., and Ted, a man to whom she was not married. When the girls were about three years old, their mother left the girls with Ted and moved in with defendant, whom she later married. The girls and their brother, R.H., would regularly visit their mother and defendant, first at an apartment in Maple Shade and later at a condominium in Evesham. The girls testified that, when they were about five years old, defendant began sexually molesting them during the visits at the Evesham residence.

According to both girls, the assaults took place at night, during the weekend visits with the mother and defendant. The twins shared a bunk bed in a back bedroom, while their step-sister, A.W., slept in a separate bed in that room. [FN 4] The twins each described incidents in which they awoke to feel defendant pulling up their sleep shirts, pulling down their underwear and touching their genitals. L.H. testified that defendant also touched her chest area and, on one occasion, placed his penis in her mouth. L.H. testified that she slept on the top bunk while her sister slept on the bottom bunk. Both girls described how defendant would stand on the bottom bunk in order to reach L.H. in the top bunk. [FN 5] According to L.H., on some occasions she would sleep in the bottom bunk and T.H. would sleep on the top bunk. On some of those occasions, defendant got into the bed with L.H., pulled her legs apart, touched her vagina with his penis, and placed it inside her vagina. She testified that this was painful.

[FN 4] A.W. was the child of M.W.B. and defendant.

[FN 5] Both girls testified that they kept their eyes closed while defendant was molesting them. But T.H. stated that she saw his legs when he was standing on the bottom bunk.

Both girls testified that they did not complain to their mother, because they were afraid she would not believe them. L.H. testified that she had told lies in the past, and thought her mother would think this was another lie. Both girls explained that they first disclosed defendant's actions to a friend, J.V., after she told them that she had been molested. The friend urged them to tell their parents what happened to them. According to both girls, Ted

2

overheard them discussing whether they should tell someone or not, and asked what they were talking about. At that point, they decided to tell him.

Defendant did not testify at the trial. Instead, the defense called two of the investigating detectives, in an attempt to establish that the girls' statements to the police contradicted their trial testimony in some respects, and that the police conducted an inadequate investigation. During cross-examination, the prosecutor elicited from the detectives that defendant and his wife disposed of the bottom bunk-bed mattress (but not the top mattress) through an internet trading website a couple of months before the investigation commenced. [FN 6]

> [FN 6] The mattress was disposed of between the time the children disclosed the alleged sexual abuse to their mother and Ted, and the time the police were called. The parties stipulated that the police tracked down the mattress, tested it, and found no sexual DNA.

The defense also presented testimony from the girls' mother and from a series of character witnesses. According to M.W.B., her romantic relationship with the girls' father, Ted, ended in the fall of 1996, when the children were very young. However, she and Ted continued "financially living together" in the same apartment, essentially as housemates, until October 1998 when she moved in with defendant. She testified that before the girls made their accusations against defendant, they had expressed a desire for her and Ted to renew their relationship.

M.W.B. also testified that T.H. had recanted her accusations. She recounted a 2007 telephone call with T.H. in which the girl stated that "she didn't understand why this was still going on and that nothing had happened anyway." M.W.B. testified that in 2008, T.H. again told her that "nothing ... had happened" and also asked "what would happen" to defendant if it turned out that someone else was the culprit. In T.H.'s direct testimony, she had denied making any of those statements.

M.W.B. testified that on occasion when the children were visiting at the Evesham apartment, she saw defendant take L.H. into one of the bedrooms for an extended period of time. However, when her counsel asked if she had entered the room "to see what was going on," M.W.B. replied that she had, and she confirmed that she never saw defendant doing anything inappropriate. According to

M.W.B., the children did not complain to her about defendant until their 2005 disclosure. She also testified that she laundered all the bed linen in the house and never saw signs of sexual activity on the children's sheets.

In an effort to show that the children might have acquired some sexual awareness from a source other than defendant's alleged conduct, defense counsel elicited from M.W.B. testimony that, while she was still living with Ted, he had a subscription to Playboy magazine. She did not testify as to whether the children ever saw the magazines. She further testified that Ted had nude photographs of her, taken when she was sixteen years old, and he kept them on his dresser where the children could see them. She was not asked, and did not explain, why she permitted him to do that. In their testimony, the girls denied seeing any nude pictures on their father's dresser.

According to M.W.B., in October 2005, she received a telephone call from her mother stating that there was something she needed to hear from L.H. and urging her to come to Ted's house immediately. When M.W.B. arrived, L.H. told her that defendant "[had] sex" with her. M.W.B. immediately examined the child and found no evidence of injury. She believed the child might be lying. Instead of calling the police or the Division of Youth and Family Services (DYFS), M.W.B. arranged for L.H. to be interviewed, two weeks later, by a retired therapist recommended by her mother. On cross-examination, she admitted to having a similar skeptical reaction when she learned of T.H.'s accusations, which she claimed she did not hear about until a week after L.H.'s disclosure. She questioned T.H. and was not convinced. She did not take either child to be examined by a doctor, nor did she notify the authorities. She testified that the therapist who spoke to L.H. found the interview "inconclusive." She also testified that L.H. had a history of lying.

M.W.B. first testified that, after the accusations were made, the children visited her house only when defendant was not present. However, she recalled that the entire family spent Thanksgiving and Christmas, 2005, and New Year's Day, 2006, at a relative's house, and the children seemed at ease interacting with defendant. Later in her testimony, M.W.B. testified that, at some point after the girls made the accusations against defendant, a situation arose in which she and Ted both needed to work and could not find a babysitter for the girls. According to M.W.B., she and Ted allowed the girls to stay at her and defendant's home, and allowed defendant to babysit the children for those three days. She testified

that the girls were asked for their consent to the arrangement and did not object. In their testimony, the girls denied that any of this occurred. They testified that they did not go to their mother's home when defendant was present.

On cross-examination, M.W.B. admitted that when the children's school reported their allegations to DYFS, the police were also notified. This occurred several months after the girls first told M.W.B. that defendant molested them. The police asked M.W.B. to participate in a "consensual intercept"—a monitored telephone call with defendant—to determine whether he would admit to the allegations. She refused. She admitted telling the police that she believed someone "traumatized" her daughters but that defendant was not the culprit.

Called as a defense witness, M.W.B.'s mother (grandmother) testified that she was present on the evening in 2005 when both girls first alleged that defendant "touched" them inappropriately. She stated that she told M.W.B. about both girls' allegations that same night and that, at her suggestion, M.W.B. immediately examined both girls. The grandmother testified that she suggested the name of a retired therapist, whom she knew. She further testified that based on her knowledge of both girls' characters, they were untruthful children.

Called by the defense, defendant's mother also testified that the girls had a reputation for being untruthful. She further testified that, when the entire family was at her house for Thanksgiving in 2005, the girls wanted to spend time with her and with defendant. The defense also presented several witnesses who attested to defendant's law-abiding character.

(Dkt. No. 9-24 at p.2-9 (footnote omitted))

Petitioner was convicted in 2009 and sentenced in 2010. Petitioner did not immediately file a direct appeal. Instead, he filed a PCR petition. The Superior Court of New Jersey, Burlington County Law Division denied petitioner's PCR petition on February 25, 2011. Petitioner appealed that denial to the Appellate Division. He also filed a motion for leave to file a direct appeal *nunc pro tunc*. The Appellate Division granted that motion and consolidated petitioner's direct appeal and appeal of the PCR denial. On October 22, 2013, the Appellate

Division affirmed the judgment of conviction and affirmed the denial of petitioner's PCR petition. The New Jersey Supreme Court denied certification on May 22, 2014. (*See* Dkt. No. 9-33)

In July, 2014, this Court received petitioner's *pro se* habeas petition filed pursuant to 28 U.S.C. § 2254. Petitioner raises several claims in his habeas petition; they are as follows:

1. The State failed to meet its burden of proof beyond a reasonable doubt that Mr. Butrim unlawfully committed sexual assaults against T.H. and L.H. and that he endangered the welfare of those children ("Claim I").

2. The jury heard impermissible other crimes evidence through the testimony of T.H. ("Claim II").

3. The trial court erroneously permitted the jury to hear the playback of only the direct testimony of the witnesses and not the cross-examination ("Claim III").

4. The trial court erred in permitting the detective to testify that he believed the charges against Mr. Butrim were proper ("Claim IV").

5. The prosecutor's comments during his summation were inappropriate and denied Mr. Butrim a fair trial ("Claim V").

6. The court erroneously ordered that Mr. Butrim's sentence for the two counts of aggravated sexual assault run consecutive to each other. The court also double counted an aggravating factor and failed to consider mitigating factors resulting in an excessive sentence ("Claim VI").

7. The trial court erred in denying Mr. Butrim's petition for PCR based on his claim of ineffective assistance of counsel where it was shown that counsel failed to prepare witnesses and did not properly advise Mr. Butrim as to his right to testify ("Claim VII").

8. The PCR court improperly denied Mr. Butrim's petition for PCR without conducting an evidentiary hearing ("Claim VIII").

9. The PCR court erred in hearing Mr. Butrim's PCR petition where the petition was barred by Rule 3:22-3 ("Claim IX").

10. Mr. Butrim did not receive effective assistance of PCR counsel in that counsel filed Mr. Butrim's PCR petition prior to filing a direct appeal and failed to support claims raised in the petition with affidavits ("Claim X").

11. The decision to forego filing a direct appeal was a gross dereliction of duty on the part of the attorney representing him during post-verdict proceedings ("Claim XI").

12. The prosecutor improperly elicited testimony to show that Mr. Butrim's wife refused to cooperate with authorities who wanted to obtain a consensual intercept, and then made improper comments during summation to suggest that Mr. Butrim's wife's actions should weigh in the determination of Mr. Butrim's guilt or innocence ("Claim XII").

13. It was plain error for the trial court to play back the direct testimony of L.H. and T.H. without playing back their cross-examination as their cross-examination was both material and impeaching ("Claim XIII").

14. Mr. Butrim was denied effective assistance of counsel at trial and on direct appeal in the following ways: (a) trial counsel was ineffective for failing to appeal the decision to replay only the victims direct testimony without also replaying their cross-examination; (b) trial counsel was ineffective for failing to challenge the reliability L.H.'s testimony by neglecting to question Detective Cranston about L.H.'s inconsistent claim that Mr. Butrim ejaculated in her mouth; (c) trial counsel was ineffective for failing to request a pre-trial hearing to determine the reliability of the testimony of L.H. and T.H.; and (d)

trial counsel was ineffective for not objecting to the prosecutor's remarks during summation ("Claim XIV").

15. Mr. Butrim was denied effective assistance of PCR counsel on initial review of claims that trial counsel was ineffective in the following ways: (a) PCR counsel knew or should have known that he had a duty to obtain an affidavit or certification from A.W. when presenting a claim that trial counsel failed to call an eyewitness at trial; (b) PCR counsel has an obligation to make sure factual allegations are supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification; (c) PCR counsel's omission deprived Mr. Butrim of the right to effective assistance of counsel on his initial review collateral proceeding ("Claim XV").

16. Constitutional violations have resulted in the conviction of Mr. Butrim, who is actually innocent, based upon ineffective assistance of trial, appellate and PCR counsels by failing to raise this issue pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2002) such that this ground should not be barred by federal review ("Claim XVI").

Respondents filed an answer in opposition to the § 2254 habeas petition. Petitioner then filed a reply brief in support of his habeas petition.[2]

---

[2] Petitioner initially sought an extension of time to file a reply brief. (*See* Dkt. No. 11) Additionally, he copied this Court on a letter he sent to respondents' counsel seeking exhibits that he claimed were not attached to respondents' response despite being listed on the Appendix. This Court granted petitioner an extension of time to file a reply brief (*see* Dkt. No. 12), which he did on January 13, 2015. (*See* Dkt. No. 13) Accordingly, at that time, this matter was fully briefed. In his reply brief, petitioner did not state a need for any documents to complete his reply. Nevertheless, several months after this matter was fully briefed, petitioner copied this Court on letters sent to respondents' counsel seeking exhibits that were purportedly not included in the appendix to respondents' brief in opposition to his habeas petition. (*See* Dkt. No. 14 & 15) However, it appears that the documents petitioner complains were in fact at least electronically filed by respondents as indicated on the CM/ECF docket as exhibits to their answer. Furthermore, to the extent that this argument could be construed as petitioner not actually receiving the hard copy of these exhibits when he received a copy of respondents' response, petitioner already had filed his reply brief such that this matter was fully briefed by the time he

# III.   HABEAS CORPUS LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also*, *Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its

---

copied this Court on letters petitioner sent to opposing counsel. Additionally, to the extent that petitioner is seeking discovery of additional documents such as the Grand Jury transcripts and/or the arrest warrants (*see* Dkt. No. 15), it is worth noting that a habeas petitioner is not entitled to discovery as a matter of ordinary course. *See Bracy v. Gramley*, 520 U.S. 899, 904 (1997).

independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner carries the burden of proof and with respect to review under § 2254(d)(1), that review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Dennis Sec'y Dep't of Corr.*, 834 F.3d 263, 353 n.10 (3d Cir. 2016) (Jordan, J., concurring in part and concurring in the judgment) (noting that while *Ylst* predates the passage of AEDPA, the *Ylst* presumption that any subsequent unexplained orders upholding the judgment will be presumed to rest upon the same ground is still valid). Additionally, AEDPA deference is not excused when state courts issue summary rulings on claims as "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

# IV.    DISCUSSION

A.  Claim I – Sufficiency of the Evidence

In Claim I, petitioner argues that the state failed to meet its burden of proof that he

committed sexual assaults against T.H. and L.H. and that he endangered the welfare of a child.

The Appellate Division stated as follows:

> Defendant contends that the trial court should have granted his
> motion for a judgment of acquittal, because the girls were not
> believable witnesses and there was no corroborating evidence. For
> similar reasons, he argues that the verdict was against the weight of
> the evidence. We cannot agree.
>
> On a Rule 3:18 motion for a judgment of acquittal at the end of the
> State's case, the trial court
>
>> must determine . . . whether, in viewing the State's
>> evidence in its entirety, be that evidence direct or
>> circumstantial, and giving the State the benefit of all
>> its favorable testimony as well as all of the
>> favorable inferences which reasonably could be
>> drawn therefrom, a reasonable jury could find guilt
>> of the charge beyond a reasonable doubt.
>
> [State v. Reyes, 50 N.J. 454, 458-[5]9 (1967).]
>
> We apply the same standard in reviewing the trial court's decision.
> State v. Pickett, 241 N.J. Super. 259, 262 (App. Div. 1990).
>
> On a motion for a new trial, premised on the verdict having been
> against the weight of the new evidence, the trial court considers
> whether "it clearly and convincingly appears that there was a
> manifest denial of justice under the law." R. 3:20-1.
>
>> A trial court may only set aside a jury verdict as
>> against the weight of the evidence if, considering
>> the jury's opportunity to assess the witnesses'
>> credibilities, a manifest denial of justice clearly and
>> convincingly appears. See R. 3:20-1. The jury is
>> free to believe or disbelieve a witness's testimony.
>> See State v. Reyes, 50 N.J. 454, 464 (1967). On a
>> motion for a new trial, the objective is not to

> second-guess the jury but to correct the injustice
> that would result from an obvious jury error.
> [State v. Saunders, 302 N.J. Super. 509, 524 (App.
> Div. 1997).]

> We review the trial judge's decision for abuse of discretion. See
> State v. Artis, 36 N.J. 538, 541 (1962).]

> Applying those standards, we find no error in the trial judge's
> decision to deny defendant's motions under either Rule 3:18 or
> Rule 3:20-1. The victims' testimony was not inherently incredible.
> Although their testimony was contradictory in some respects, it
> was consistent in its most important details. If believed, their
> version of events provided ample proof to support defendant's
> conviction. Moreover, the defense rested largely on the testimony
> from the girls' mother, M.W.B. Reasonable jurors could have
> found her highly unsympathetic and her testimony not believable.
> They could also have found it suspicious that she and defendant
> discarded the girls' mattress after they revealed the molestation to
> their parents but not before the police became involved.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction, if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A petitioner raising an insufficiency of the evidence claim faces a "'very heavy burden' to overturn the jury's verdict for insufficiency of the evidence." *United States v. Root*, 585 F.3d 145, 157 (3d Cir. 2009) (citing *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998)). In analyzing a sufficiency of the evidence claim, a court examines both the direct and circumstantial evidence in their totality. *See United States v. Pavulak*, 700 F.3d 651, 668 (3d Cir. 2012) (citations omitted). "[F]ederal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter

of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (citation omitted). The credibility of witnesses, the resolution of conflicts of evidence, and the drawing of reasonable inferences from proven facts all fall within the exclusive province of the factfinder and, therefore, are beyond the scope of federal habeas sufficiency review. *See Jackson*, 443 U.S. at 319.

   i.  *Sexual Assaults Against T.H. and L.H.*

   Petitioner first argues that there was insufficient evidence to convict him of sexual assault against T.H. and L.H. Under New Jersey Law, "an actor is guilty of aggravated sexual assault if he commits an act of sexual penetration with another person under any one of the following circumstances: (1) The victim is less than 13 years old[.]" N.J. Stat. Ann. § 2C:14-2a(1). New Jersey law further provides that "an actor is guilty of sexual assault of he commits an act of sexual contact with a victim who is less than 13 years old and the actor is at least four years older than the victim." *Id.* § 2C:14-2(b). Sexual penetration is defined as "vaginal intercourse, cunnilingus, fellatio or anal intercourse between persons or insertion of the hand, finger or object into the anus or vagina by the actor or upon the actor's instruction. The depth of insertion shall not be relevant as to the question of commission of the crime." *Id.* 2C:14-1(c).

   During trial, L.H. testified that petitioner would kiss her. (*See* Dkt. No. 9-35 at p.22) She testified that she knew it was him because he was the only male adult in the family and one time she felt his beard on her face. (*See id.* at p.23) Furthermore, L.H. testified that petitioner would touch her under her shirt and on her "private area" with his hands and with his private spot (*See id.* at p.24) She stated that petitioner would pull her underwear down. (*See id.* at p.25) He would put his private part on the outside and inside of her private part. (*See id.* at p.26) She further testified that petitioner kissed her private area and chest in addition to her lips. (*See id.* at p.27) L.H. also stated that petitioner would put his private area into her mouth. (*See id.* at p.29) L.H.

also testified that this started when she was six years old and occurred for a couple of years. (*See id.* at p.30)

T.H. testified that petitioner would lift her shirt while she was sleeping. (*See id.* at p.56) He would also pull down her shorts/underwear. (*See id.*) He would then touch her vagina. (*See id.* at p.57) T.H. also testified that he would blindfold her and put chocolate or strawberry milk stuff on his penis and have her taste it. (*See id.* at p.60-61)

Petitioner is not entitled to habeas relief on his claim that there was insufficient evidence to convict him of sexual assault. His argument is more akin to challenging the credibility of the two victims. This was the province for the jury to decide. *See United States v. Soto*, 539 F.3d 191, 194 (3d Cir. 2008) ("In examining a sufficiency of the evidence claim, [i]t is not for us to weigh the evidence or to determine the credibility of witnesses.") (internal quotation marks and citations omitted). Accordingly, petitioner is not entitled to federal habeas relief on this claim in light of the victims' testimony that implicated him.

ii.    *Endangering the Welfare of a Child*

Petitioner also claims that there was insufficient evidence to convict him of endangering the welfare of a child. In New Jersey, a person is guilty of endangering the welfare of a child in the second degree if he "engages in sexual conduct which would impair or debauch the morals of the child[.]" N.J. Stat. Ann. § 2C:24-4(a). "[T]he focus in a prosecution for endangering the welfare of a children shifts from the mental state of the actor in performing the lewd conduct to the potential effect that such conduct may have on the morals of the child or children who are witness to the conduct." *State v. Hackett*, 764 A.2d 421, 426 (N.J. 2001). Endangering the welfare of a child does not merge with sexual assault where the child endangerment conviction is

also directed at the defendant's violation of his parental duty. *See State v. D.R.*, 537 A.2d 667, 682 (N.J. 1988).

Similar to his arguments with respect to his sexual assault convictions, petitioner's arguments with respect to his endangering the welfare of a child relate to the credibility of the victims' testimony. This was for the province of the jury to decide given the testimony of the victims' that implicated petitioner as outlined above. Thus, petitioner is not entitled to federal habeas relief on Claim I.

B.  Claim II – Other Crimes Evidence

Petitioner argues in Claim II that the jury heard impermissible other crimes evidence through the testimony of T.H. when she testified that petitioner sexually assaulted R.H. Petitioner asserts that inclusion of this evidence does not fall within any of the exceptions enumerated in New Jersey Rules of Evidence 404(b).[3] The Appellate Division analyzed this claim as follows:

> We find no plain error in T.H.'s passing comment about her brother, R.H. The testimony arose in this context. During T.H.'s testimony, the prosecutor questioned her as to how long the sexual assaults lasted, and the following exchange occurred:
>
> Q:  Okay. And how old were you when it stopped?
> A:  Ten or eleven.
> Q:  When it stopped with you?
> A:  Both.

---

[3] New Jersey Rule of Evidence 404(b) provides that:

> Except as otherwise provided by Rule 608(b), evidence of other crimes, wrongs or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

N.J.R.E. 404(b).

> Q: When you say both, what do you mean both?
> A: I mean, like all of us, me, [L.H.] and [R.H.].
>
> Defense counsel did not object. The prosecutor then asked if T.H. had seen defendant touch "any of the other children in the house, [R.H.] and [A.W.]?" to which T.H. replied "No." We conclude that the prosecutor's follow-up question, which referred to the brother and the step-sister, effectively neutralized any possible implication that T.H. was accusing defendant of molesting anyone besides herself and L.H.

(Dkt. No. 9-24 at p.20-21)

At the outset, to the extent that petitioner is arguing that the state court erred in permitting T.H. to make the statement at trial regarding R.H., this would be a state evidentiary question that is not appropriate for this Court to review in these federal habeas proceedings. *See Wilson v. Vaughn*, 533 F.3d 208, 213 (3d Cir. 2008) ("Admissibility of evidence is a state law issue.") (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)). The due process inquiry that is applicable to this claim is whether the admission of this evidence was so arbitrary or prejudicial that it rendered the trial fundamentally unfair. *See Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994); *see also Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001) (noting that to show an evidentiary error rises to the level of a due process violation, a petitioner must show "that it was of such magnitude as to undermine the fundamental fairness of the entire trial.") The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990).

Petitioner has failed to show that T.H.'s passing comment about her brother during trial rendered his trial fundamentally unfair. Indeed, as noted by the state court, immediately after T.H.'s statement that included her brother, T.H. testified that she never saw petitioner touch anyone else, which would obviously include her brother. (*See* Dkt. No. 9-35 at p.66) Thus, immediately after T.H.'s statement, the jury also heard from T.H. that she never saw the

petitioner touch her brother. Additionally, the trial judge specifically instructed the jury during

the charge that the charges against petitioner related to T.H. and L.H. (*See* Dkt. No. 9-37 at p.60-

65)

Within this claim, petitioner also alleges that "not only did T.H. refer to the allegation

that Mr. Butrim had inappropriately touched R.H. in the past, but she also included R.H. in her

account of the incident in the kitchen." (Dkt. No. 3 at p.20) For context, the relevant colloquy

took place between T.H. and the prosecutor during trial with respect to the incident in the

kitchen:

> Q:  Okay. Did he ever take his penis and touch parts of you with his penis?
> A:  I don't remember. I mean –
> Q:  Okay. Did he ever touch your mouth with it?
> A:  I think one time when I was living in, when he was living in Buttonwood, he'd like take us into the kitchen and put like chocolate milk stuff and like strawberry stuff on his thing and we'd be blindfolded and taste it. . . .
> Q:  Okay. Now in Buttonwood, tell me about this. Tell me what it is you're describing there.
> A:  He'd go in the kitchen and I guess he'd put stuff on him, but then he'd blindfold us and said try it and then –
> Q:  Okay. This what your telling me know, did this, did this happen during the day or the night?
> A:  Day when my mom was at work.
> Q:  Okay. These would be times when you, [L.], [R.] and [A.] would all be home?
> A:  Uh-huh.
> Q:  Okay. Would everybody be awake? Because in Buttonwood there's only one bedroom, right?
> A:  Uh-huh.
> Q:  Okay. Would everybody be awake?
> A:  Yes, in the living room.
> Q:  Okay. And was there a wall between the living room and the dining room or the living room and the kitchen?
> A:  No. Well, the kitchen, yes.
> Q:  There's a wall between the living room and the kitchen?
> A:  Uh-huh.
> Q:  So tell me and the jury then what it is you're describing. Tell me what would happen there.

A:  He'd put the stuff on his, I think, I guess on his thing, and he'd say taste this and we did.

Q:  Did he take everybody in there at once?

A:  Not Autumn, no not at once, different times.

Q:  Okay. Talk about when he brought you in there, okay. He'd bring you in the kitchen, right?

A:  Uh-huh.

Q:  Where would you sister and your brother be?

A:  Living room.

Q:  Okay. What would they be doing?

A:  Watching TV.

Q:  Okay. And there's a wall between the kitchen and the living room?

A:  There's a living room, then the dining room, then the kitchen.

Q:  Okay. Could you see from the living room into the kitchen?

A:  No.

Q:  You could not?

A:  No.

Q:  What would happen inside the kitchen?

A:  He'd put stuff on his thing and he'd say taste it.

Q:  Okay. And what would you do?

A:  Tasted it. I didn't know what –

Q:  Okay. . . .

Q:  Let me finish up with what you were talking about with the, you call the chocolate milk stuff. It comes in a jar or a squeeze bottle?

A:  Uh-huh.

Q:  You use it to make white milk into chocolate milk?

A:  Uh-huh.

Q:  When you say he would put it on his, on his private area, can you tell me what it looked like, his private area?

A:  I was blindfolded.

Q:  You were blindfolded. Okay. When you tasted it, what would he do? I mean, was he sitting, was he standing, was he moving?

A:  Standing.

Q:  He was what?

A:  Standing.

Q:  Okay. And what would happen while this was –

A:  Just stand there.

Q:  How long would that last?

A:  Just to taste it.

Q:  Okay. So quick versus long?

A:  Uh-huh.

Q:  Short versus long?

A:  Uh-huh.

Q: When you were done, this was done, what did you do or what
did he do with you?
A: Just I went into the living room.
Q: And what did you do with the blindfold?
A: Took it off.
Q: And where would you leave it?
A: Give it to him.
Q: Did you ever see this happen to your sister Lauren?
A: No.
Q: Did you ever see this happen to anybody else in the house?
A: No. . . . .
Q: And just so I'm clear so we can move forward, what you talked
about at Buttonwood with the chocolate syrup never happened out
at Kings Grant?
A: No.
Q: You never saw that either to your sister [L.H.] or anybody else
in the house?
A: No.

(Dkt. No. 9-35 at p.60-64)

As the above colloquy indicates, the prosecutor clarified with T.H. that she never saw

petitioner do this to R.H. As such, the reference by T.H. to "we" could have been a reference to

L.H. For these reasons, this Court does not find that this testimony amounted to a due process

violation by making petitioner's trial fundamentally unfair. Accordingly, petitioner is not entitled

to federal habeas relief on Claim II.

   C. Claim III – Permitting the Jury to only hear playback of direct testimony of the victims

In Claim III, Petitioner argues that the trial court erred in only having the direct testimony

of the two victims, L.H. and T.H. played back to the jury. The Appellate Division analyzed this

claim as follows:

The trial was recorded on video, making video playback the only
practicable means to re-play testimony during jury deliberations.
The trial was conducted on three successive days, May 5-7, 2009.
The two girls testified on the first day of the trial. The jury began
deliberating at around 2:30 p.m. on the third day. They returned
their verdict at about 6:45 p.m. During their deliberations, they
asked for a playback of the testimony of the two girls. After being

questioned by the judge, they made clear that they only wanted to hear the direct testimony.

Shortly after hearing the playback, they sent out a question asking whether they had to find defendant guilty of all of the charges or whether they could convict him of only some of the charges. The judge instructed them that they had to consider each charge separately. Shortly thereafter, they returned the verdict, acquitting defendant of forcing L.H. to perform fellatio, but convicting him of all other charges.

Defendant contends the judge should have required the jury to hear the cross-examination of both girls, because it contained significant impeachment of their testimony. At the time the trial was conducted in 2009, the controlling law on jury readbacks was set forth in State v. Wilson, 165 N.J. 657 (2000). There the Court emphasized the trial court's obligation to first ascertain the scope of the jury's request and then to honor it:

> [A]s a general rule, if a jury requests a readback of the testimony of a witness, the readback should include both direct and cross-examination. The reason is obvious:  cross-examination affords a full view of the witness's testimony including inconsistencies and impeaching material. Thus, a jury's uncircumscribed request for a readback of a witness's testimony ordinarily is "presumed to include cross-examination."

> That is not to suggest that a witness's entire testimony is required to be read back in every single case. We assume that when jurors request a readback, what is being sought is "only . . . those portions of the testimony about which they are in doubt or disagreement." Accordingly, where a request is clearly circumscribed, the trial court has no obligation to compel jurors to hear testimony they have not asked for or to continue a readback after they have expressly indicated that they have heard enough. That is so even if one of the parties registers a request for a further readback.

> But if the scope of the jury's request is unclear or if something occurs during the readback to raise a question about the extent of the testimony sought, the obligation of the trial court is to ascertain the

will of the jury. For example, in this case, the jury
did not initially limit its request to direct
examination. However, at the end of the readback of
the direct testimony of a witness, when the tape was
stopped briefly, the reconstructed record reveals
that the foreperson of the jury said something to the
effect of "okay, fine," and the jurors got up to leave.
The trial court and the lawyers took that as a signal
that the jurors had heard enough, although defense
counsel continued to argue that they should be
"required" to hear the whole statement. To lay to
rest any possible doubt regarding the meaning to be
ascribed to the jurors' words and actions, and for
record purposes, it would have been preferable for
the trial court to have asked the jury directly
whether it wished to hear the cross-examination of
the witness. Whenever there is the slightest doubt,
such an inquiry should ensue.

[Id. at 660-62].

The trial judge scrupulously adhered to the requirements of
Wilson. However, two years after this trial was conducted, the
Court decided State v. Miller, 205 N.J. 109 (2011), which
specifically addressed the use of playbacks in video-recorded
trials. In Miller, there was no issue concerning a jury's request to
hear limited testimony. After the jury requested a playback of a
witness's testimony, the judge ordered a play-back of the entire
direct and cross-examination of that witness. However, the Court
set forth guidelines for the playback of video testimony in future
cases.

Citing Wilson, the Court emphasized the trial courts' discretion to
permit limited playbacks, after determining precisely what
testimony the jury wishes to have played back. Id. at 122-23. But
the Court emphasized that, ordinarily, a playback must include
both the direct and cross-examination:

(1) As noted before, judges should ordinarily grant
a jury's request to play back testimony. They should
not decline a request because it "would take time."
(2) As a general rule, after redacting sidebars and
inadmissible testimony to which counsel objected,
the entire testimony requested should be played
back – including direct and cross examination – so
that evidence may be considered in its proper

context. See Wilson, supra, 165 N.J. at 660-61. Only then can a jury hear both direct proofs as well as inconsistencies and impeachment material. Trial judges nonetheless retain discretionary authority to try to narrow a jury's request if it calls for the playback of extensive testimony.

(3) Courts should honor a jury's specific request to hear only limited parts of a witness' testimony – provided, once again, that playback includes relevant direct and cross examination. Jurors should not be required to watch or hear more testimony than they ask for. If necessary, the trial judge can clarify what testimony the jury wants repeated.

(Id. at 122-23 (additional citations omitted).]

In State v. A.R., 213 N.J. 542, 555 (2013), the Court repeated the "precautions" a trial court must take during video replays of testimony, including "providing the entirety of the requested testimony, including direct and cross-examination."
We certainly cannot fault the trial judge for following Wilson, which was the prevailing law at the time. Further, it is unclear whether Miller absolutely and in all cases requires that a jury hear a playback of both direct and cross-examination, even if the jury has explicitly indicated to the trial judge that it only wants a playback of the direct testimony. However, applying Miller, we conclude that if it was error not to play back both cross and direct, the error was harmless. [FN 7]

[FN 7] In a future case, however, it would certainly be prudent to reply both the direct and cross-examination. If a playback of the entire direct and cross would be unduly time consuming, the better practice would be to encourage the jury to be more specific about what subject matter areas of the direct examination it wishes to hear, and to limit the playback of both the direct and cross to those areas. See Miller, supra, 205 N.J. at 123.

Having read the trial transcript, we find that the cross-examination of these girls was not particularly effective, and the most significant contradictions in the testimony were not between each girl's direct and cross. They were between their respective direct testimonies. For example, L.H. testified that she sometimes slept in the bottom bunk, although she usually slept in the top bunk. There

were also contradictions in the testimony concerning whether they discussed defendant's improper conduct with each other before they revealed it to their mutual friend J.V. It is understandable that the jury would have wanted to hear each girl's direct testimony, one after the other, to compare their versions.

Moreover, if the jury heard a playback of the cross, they would also, presumably, have had to hear a playback of the redirect, which was effective in neutralizing most of the cross. On this record, we conclude that defendant was not prejudiced because the jury did not hear a playback of the girls' entire trial testimony. Further, the record does not support defendant's contention that the jurors wanted to skip hearing the cross-examination because they felt rushed. It is clear from their dialogue with the judge that he was not rushing them. Rather, the jurors wanted to stay as long as required to finish their deliberations.

(Dkt. No. 9-24 at p.11-16)

At the outset, petitioner has not cited to, nor has this Court found, Supreme Court precedent delineating the manner in which a trial court should respond to a jury's request to have testimony read or played back for them. *See Beltran v. Hastings*, No. 12-2042, 2014 WL 1665727, at *23 (D.N.J. Apr. 24, 2014) (noting that neither the petitioner nor the Court has located Supreme Court precedent regarding how the trial court should respond to a jury's request to have certain testimony read back to them) (citations omitted); *see also Ewell v. Scribner*, 490 F. App'x 891, 893 (9th Cir. 2012) ("There is no clearly established Supreme Court authority that a jury's playback of a tape that was admitted into evidence violates a defendant's constitutional rights.") Accordingly, to prevail on this claim, petitioner must establish that the court's actions violated the "'fundamental fairness' essential to justice." *Marra v. Larkins*, 46 F. App'x 83, 87 (3d Cir. 2002) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).

As noted by the Appellate Division, while the jury did not initially limit its request with respect to the particular portions of testimony from the two victims they wanted readback, their

subsequent actions made clear the portions of the testimony they wanted to hear. During the

playback of L.H.'s testimony, the following colloquy occurred:

> MR. LUCIANO:  Judge.
> THE COURT:  Yes.
> THE JUROR:  Would we be allowed now to fast forward to
> [T.H.'s] testimony?
> THE COURT:  It's your --
> THE JUROR:  All right. Would you please?
> THE COURT:  Is that the consensus of the jury?
> THE JURY:  Yes.

(Dkt. No. 9-37 at p.74) Subsequently, after a portion of the video from T.H. was then played, the

jury stated that they had seen enough and wanted to now go back to deliberate. (*See id.* at p.77)

The Court's actions did not violate petitioner's right to fundamental fairness. Indeed, the

trial court permitted the playback of testimony as requested by the jury. Petitioner complains that

by not playing back the victims' cross-examination testimony, the jury skipped over

inconsistencies in their testimony. However, as the Appellate Division noted, the significant

inconsistencies arose from disparities between their direct testimony. Thus, the jury was able to

hear inconsistencies between the girls' testimony during the playback. Accordingly, the

Appellate Division's denial of this claim was not based on an unreasonable application of clearly

established federal law and did not result in a decision based on an unreasonable determination

of the facts. Therefore, petitioner is not entitled to federal habeas relief on Claim III.

D.  Claim IV – Detective Testifying Belief that Charges were Proper

Petitioner asserts in Claim IV that:

> [w]hen the prosecutor asked the investigative detective if he was
> "satisfied" that charges had been properly filed in this case, that
> testimony crossed the line from factual testimony to opinion
> testimony, which sought to impermissibly invade the province of
> the jury and express a view on the ultimate question of guilt or
> innocence.

(Dkt. No. 3 at p.23)

During cross-examination by the prosecutor of Detective Cranston, the relevant colloquy took place:

> Q:  When you say that you want the interview to proceed based on what the victim tells you, every time you interview a child sexual assault victim, you don't make an arrest in the case, do you?
> A:  No.
> Q:  Every time you interview a child sexual assault victim, you don't file charges against the person, do you?
> A:  No.
> Q:  And that's based on – [defense counsel] asked you your pursuit of the truth, right?
> A:  Correct.
> Q:  You must be satisfied then as an investigator that in this case –

(Dkt. No. 9-36 at p. 14) At that point, defense counsel objected and argued that the prosecutor was asking Cranston whether the charges were proper or not. (*See id.*) Ultimately, the trial judge overruled the objection stating that Cranston was not giving an opinion as to any substantive charges at that point. (*See id*. at p.15) In resuming his questioning of Cranston, the following colloquy then took place:

> Q:  So, Detective, you're not filing charges in every case, correct?
> A:  That's correct.
> Q:  You're not arresting people in every case, correct?
> A:  Correct.

(*Id.*)

The Appellate Division analyzed this claim as follows:

> Defendant next complains of error in Detective Cranston's trial testimony, which he claims constituted an impermissible opinion on his guilt. *See State v. McLean*, 205 N.J. 438, 460 (2011). We find nothing impermissible in the testimony. As previously noted, part of the defense was an attack on the police investigation. Consistent with that litigation strategy, the defense called Detective Cranston, one of the investigating officers, as a defense witness. Defense counsel asked Cranston a series of questions implying that the detective had conducted an inadequate and

> biased investigation. In response, on cross-examination, the prosecutor asked Cranston a series of questions designed to show that he conducted a fair and thorough investigation. In that context, he asked Cranston if he filed charges based on his investigation in every case he handled. The detective replied that he did not. The prosecutor then asked Cranston if he was "satisfied" that the charges he filed in this case were proper. However, Cranston did not answer, because defense counsel objected and the prosecutor did not pursue that question. We find nothing objectionable in the questions Cranston did answer.

(Dkt. No. 9-24 at p. 18-19)

Similar to Claim II, to the extent that petitioner is asserting an error of state law in Claim IV, that is insufficient to warrant granting federal habeas relief. *See Wilson* 533 F.3d at 213 (citing *Estelle*, 502 U.S. at 72). Thus, the only way petitioner would be entitled to federal habeas relief on Claim IV is if he showed that Cranston's testimony violated his due process rights by making his trial fundamentally unfair. However, as noted by the Appellate Division, despite overruling the objection, the prosecutor did not return to questioning Cranston about whether he was "satisfied" that the charges in petitioner's case were proper. Therefore, petitioner fails to show that this made his trial fundamentally unfair as Cranston never answered the question that petitioner objects to in this claim. Accordingly, petitioner is not entitled to federal habeas relief on Claim IV.

E. Claim V – Prosecutor's Comments During Summation

In Claim V, petitioner asserts that the prosecutor committed misconduct during the course of his summation. Petitioner claims that the prosecutor shifted the burden of proof to the defense by implying that M.W.B.'s actions were evidence of M.W.B.'s guilt. More specifically, petitioner claims that the prosecutor disparaged the type of parent M.W.B. was by stating that after the allegations against petitioner were made, M.W.B. swapped the bottom bunk bed for another and the fact that the prosecutor criticized M.W.B. for not believing her children's

allegations against petitioner. Petitioner also asserts that the prosecutor criticized M.W.B. for putting her children in a difficult situation by leaving them no option but to spend the holidays with petitioner after the allegations of abuse were made. Petitioner claims that there was not testimony to support this conclusion, but, rather, that M.W.B. had testified that the children were given the option to spend the holidays with her and to not have petitioner present. During summation, the prosecutor also commented on the fact that M.W.B. did not agree to place a phone call to her husband with a consensual intercept after the allegations were made and the police were involved. Petitioner takes exception to the prosecutor then commenting that if M.W.B. believed her husband was innocent, she would have made the intercepted phone call. Petitioner claims that the prosecutor's statements implied that M.W.B.'s actions or inactions supported a finding of petitioner's guilt. According to petitioner, "whether [M.W.B.] believed her husband was innocent or guilty was irrelevant to the jury[']s task of making its own determination of innocence or guilt." (Dkt. No. 3 at p.23)

The Appellate Division decided this claim as follows:

> Defendant also claims the prosecutor committed misconduct in commenting on M.W.B.'s conduct in failing to believe her children's allegations and refusing to participate in a consensual intercepted phone call to defendant. There was no objection to those remarks, and we find they were a fair comment on the evidence. In fact, in his summation, defense counsel anticipated that the prosecutor might comment on the mother's actions, and reminded the jury that her conduct was not the issue in the case. However, we find that the mother's conduct was relevant to her credibility. Much of M.W.B.'s testimony was aimed at convincing the jury that her daughters were untruthful. The State was entitled to present evidence of her bias.

> The State also needed to explain to the jury why the children did not report the abuse earlier. The girls testified that they delayed reporting defendant's conduct, because they were afraid their mother would not believe them. In summation, the prosecutor was entitled to argue to the jury that the children's fears were justified,

> because M.W.B. was a parent who put her relationship with her
> husband ahead of her children's well-being.

(Dkt. No. 9-24 at p.19-20)

A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial fundamentally unfair. *See Darden v. Waingright*, 477 U.S. 168, 182-83 (1986). A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (internal quotation marks and citation omitted). A prosecutorial misconduct claim is examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). A "reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

The state court did not unreasonably apply clearly established federal law in denying relief on this claim. As noted by the state court, the mother's credibility was an issue in the case. The state therefore could present evidence of her bias or lack of credibility. Nothing the prosecutor said in summation with respect to M.W.B. so infected the trial with unfairness. Accordingly, petitioner is not entitled to federal habeas relief on this claim.

F. Claim VI – Sentencing

Petitioner argues in Claim VI that the trial court erroneously ordered that his sentence for the two counts of aggravated sexual assault should run consecutively. Petitioner also complains that the trial court double counted an aggravating factor and failed to consider mitigating factors in arriving at his sentence.

The Appellate Division analyzed petitioner's sentencing arguments raised in state court as follows:

> [D]efendant contends that the sentence was excessive. We find no abuse of discretion or other error in the twenty-six year sentence, was eighteen years lower than the forty-four year sentence demanded by the state. See State v. Bieniek, 200 N.J. 601, 607-08 (2010); State v. Roth, 95 N.J. 334, 365-66 (1984). The judge properly imposed consecutive sentences for the aggravated sexual assaults on the two victims. See State v. Yarbough, 100 N.J. 627, 643-44 (1985), cert. denied, 475 U.S. 1014, 106 S. Ct. 1193, 89 L.Ed.2d 308 (1986). However, she imposed concurrent sentences on the child endangerment convictions, even though she found they did not merge with the sexual assault convictions. Defendant's arguments on this point warrant no further discussion. See R. 2:11-3(e)(2). We affirm the sentence, substantially for the reasons stated by Judge Jeanne T. Covert on the record on February 19, 2010.

(Dkt. No. 9-24 at p.21-22)

As this Court has noted:

> "A federal court's ability to review state sentences is limited to challenges based upon proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies.'" *Merritt v. Bartkowski*, No. 11-3756, 2013 WL 4588722, at *15 (D.N.J. Aug. 28, 2013) (quoting *Grecco v. O'Lone*, 661 F. Supp. 408, 415 (D.N.J. 1987) (citation omitted)). Thus, a challenge to a state court's discretion at sentencing is not reviewable in a federal habeas proceeding unless it violates a separate federal constitutional limitation. *See Pringle v. Court of Common Pleas*, 744 F.2d 297, 300 (3d Cir. 1984). *See also* 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 62, 67.

*Burns v. Warren*, No. 13-1929, 2016 WL 1117946, at *43 (D.N.J. Mar. 22, 2016).

Petitioner provides no federal constitutional basis challenging his sentence. Nevertheless:

> [t]he Supreme Court has explained that the "Eighth Amendment, which forbids cruel and unusual punishments, contains a narrow proportionality principle that applies to non-capital sentences." *Ewing v. California,* 538 U.S. 11, 20, 123 S.Ct. 1179, 1185, 155 L.Ed.2d 108 (2003) (citations omitted). A court must consider three proportionality factors when evaluating Eighth Amendment

challenges: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other jurisdictions. *Solem v. Helm,* 463 U.S. 277, 290–92, 103 S.Ct. 3001, 3010, 77 L.Ed.2d 637 (1983). In conducting this analysis, a court grants substantial deference to legislative decisions regarding punishments for crimes. *United States v. Rosenberg,* 806 F.2d 1169, 1175 (3d Cir.1986); *Miknevich,* 638 F.3d at 186 ("Generally, a sentence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment ... because we accord substantial deference to Congress, as it possesses broad authority to determine the types and limits of punishments for crimes.").

The first factor acts as a gateway prong to the proportionality inquiry. The Eighth Amendment, after all, only forbids sentences that are "grossly disproportionate" for a conviction for the crime involved. If the defendant fails to demonstrate a gross imbalance between the crime and the sentence, a court's analysis of an Eighth Amendment challenge is at an end. Successful proportionality challenges in non-capital cases are "exceedingly rare." *Ewing,* 538 U.S. at 21, 123 S.Ct. at 1185 (quoting *Rummel v. Estelle,* 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382 (1980)).

*United States v. Burnett*, 773 F.3d 122, 136–37 (3d Cir. 2014).

Petitioner fails to demonstrate that his sentence violates any federal constitutional rights. Petitioner's sentence of twenty-six years imprisonment does not rise to the level of disproportionality that violates the Eighth Amendment. *Accord Radich v. Attorney General of State of N.J.*, No. 03-4615, 2005 WL 2129309, at *4 (D.N.J. Aug. 31, 2005) (petitioner's sentence of thirty years on two counts of first degree aggravated assault and two counts of second degree sexual assault amongst other charges does not rise to level of disproportionality under the Eighth Amendment). It is also worth noting that petitioner's sentence of fourteen years for the aggravated sexual assault of L.H. and twelve years for the aggravated sexual assault of T.H. fell within the statutory limits of 10-20 year sentences for crimes in the first-degree. *See*

N.J.S.A. § 2:C:43-6(a)(1). Accordingly, petitioner is not entitled to federal habeas relief on

Claim VI.

G. Claim VII – Ineffective Assistance of Counsel

In Claim VII, petitioner argues that counsel was ineffective. First, he claims that defense

counsel introduced the testimony of two state investigators who added nothing beneficial to his

case, but instead, brought out information that was detrimental to his case. The Appellate

Division denied relief on this argument for substantially the reasons stated by the Superior Court,

Burlington County Law Division in its opinion dated February 25, 2011. (*See* Dkt. No. 9-24 at

p.25) The Superior Court first laid out the relevant standard for analyzing an ineffective

assistance of counsel claim as follows:

> A hearing on a defendant's claim of ineffective assistance of
> counsel is only required when he has established a *prima facie* case
> of same. To establish a *prima facie* case, a defendant must
> demonstrate a reasonable likelihood of succeeding under the test
> set forth in Strickland v. Washington, 466 U.S. 668 (1984). This
> requires a defendant to "allege facts sufficient to demonstrate
> counsel's alleged substandard performance." State v. Cummings,
> 321 N.J. Super. 154, 170 (App. Div. 1999).
>
> While the Sixth Amendment to the United States Constitution
> provides defendants with the right to the assistance of counsel,
> courts have consistently held that this provision guarantees not
> only the assistance of counsel, but "effective assistance."
> Strickland, supra, 466 U.S. at 686. In evaluating an ineffective
> assistance of counsel claim, New Jersey follows the federal
> guidelines, see State v. Fritz, 105 N.J. 42, 91987), and adopts the
> two-prong test articulated by the Supreme Court in Strickland. The
> standard for judging ineffective assistance of counsel claims is
> whether counsel's conduct so undermined the proper functioning
> of the adversarial process that the trial cannot be relied on as
> having produced a just result. Strickland, 466 U.S. at 686. The
> Strickland standard is as follows:
>
>> First, Defendant must show that counsel's
>> performance was deficient. This requires showing
>> that counsel made errors so serious that counsel was

not functioning as the 'counsel' guaranteed
defendant by the Sixth Amendment. Second,
Defendant must show that the deficient performance
prejudiced the defense. This requires showing that
counsel's errors were so serious as to deprive
defendant of a fair trial, a trial whose result is
reliable. Unless a defendant can make both
showings, it cannot be said that the conviction . . .
resulted from a breakdown in the adversary process
that renders the result unreliable." [Strickland, 466
U.S. at 687; See also State v. Fritz, supra, 105 N.J.
at 52].

In order to meet the first prong of Strickland, a defendant must
demonstrate that counsel's performance was deficient. 466 U.S. at
687. The burden of proving that counsel's representation fell below
the prevailing professional norms lies with the defendant.
Kimmelman v. Morrison, 477 U.S. 365, 381 (1986). "The
reasonableness of counsel's performance is to be evaluated from
counsel's perspective at the time of the alleged error and in light of
all the circumstances, and the standard of review is highly
deferential. Ibid. Further, the defendant must overcome a strong
presumption that counsel's conduct falls within the wide range of
reasonable professional assistance. Strickland, supra, 466 U.S. at
689. Also, "strategic choices made after thorough investigation of
law and facts relevant to plausible options are virtually
unchallengeable." Id. at 690-91. Finally, the defendant must do
more than make "bald assertions" of ineffective assistance of
counsel. State v. Cummings, 321 N.J. Super. 154, 170 (App. Div.
1999), certif. denied. 162 N.J. 199 (1999).

To satisfy the second prong of the Strickland test, the defendant
must demonstrate that counsel erred so seriously that defendant
was deprived of a fair trial with reliable results. 466 U.S. at 687. In
attempting to meet the requirements of the second prong, a
showing that the alleged errors "had some conceivable effect on
the outcome of the proceeding" is insufficient. Id. at 693. The
defendant must show "a reasonable probability that, but for
counsel's unprofessional errors, the results of the proceeding
would have been different." Id. at 694. "A reasonable probability is
a probability sufficient to undermine confidence in the outcome."
Ibid.

(Dkt. No. 9-15 at p.11-13) With respect to analyzing petitioner's claim that counsel was

ineffective by calling the two investigating officers as witnesses, the state court stated as follows

with respect to this argument:

> Defendant next argues that the decision to call the investigating officers was a fatal mistake because he allowed the State to lead the officers through favorable testimony during cross-examination. However, a reviewing court must grant substantial deference to the discretion of the trial counsel because of the difficulty in determining which witnesses to call for strategic purposes. State v. Arthur, 184 N.J. 307, 321 (2005). This heightened deference given to strategic decisions is only overcome when the defendant shows that the decision was based upon a lack of preparation for trial. Id. at 322-23. That is not the case here.

> The defendant in Arthur asserted that counsel was ineffective because he failed to call the defendant's fiancée and another individual to testify that he did not distribute cocaine to anyone. The defendant informed his attorney that the proffered witness would be available to testify, but they were not produced at trial. Id. at 328. The defendant's fiancée subsequently provided him with an affidavit and testified at his hearing for post-conviction relief. Her affidavit revealed that defense counsel had advised her that she would not be needed. In addition, she testified that counsel advised her that "she would not have been a credible witness because she was defendant's girlfriend." The Court considered these circumstances and held that defendant's counsel made a strategic trial decision when he decided not to call the fiancée to the stand. Id. at 326.

> In the present case, defense counsel's strategic decisions did not evidence a lack of preparation on his part. Defense counsel attempted to demonstrate that the State inadequately investigated the case. For example, defendant's attorney pointed out that Detective Cranston did not look for the therapist who met with L.H., nor did he speak with Thomas [H.] prior to speaking with the accusers. He also elicited that Detective Cranston did not know the children's grandmother, Susan Willows, and did not interview her at all. [2T16:24-19:24]. Moreover, through Detective Weisbrot, defense counsel showed that T.H. thought that defendant never climbed on L.H.'s bed and that he probably would have broken the bed if he had attempted to do so. Detective Weisbrot also testified that T.H. told him that defendant had only touched her with his hand and never fully undressed her. [2T48:12-51:11].

> Defendant argues here that his counsel was ineffective because Detectives Cranston and Weisbrot turned out to be "better witnesses for the State" than they were for the defense. However, defendant has failed to show that the alleged mistakes made by his trial counsel were such that warrant piercing the "extreme deference" given to a trial counsel's strategy. Here, there is no evidence to show that these alleged "mistakes" were due to poor preparation of a total lack of trial strategy. For these reasons, defendant has not met the <u>Strickland</u> test.

(Dkt. No. 9-15 at p.19-21)

In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated the two-prong test for demonstrating when counsel is deemed ineffective. First, the petitioner must show that considering all of the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett,* 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim in light of all of the circumstances) (citation omitted). A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland,* 466 U.S. at 690. Under this first prong of the *Strickland* test, scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689. Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax,* 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland,* 466 U.S. at 690–91). If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that

reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn,* 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland,* 466 U.S. at 690–91).

The second prong of the *Strickland* test requires the petitioner to affirmatively prove prejudice. *See* 466 U.S at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale,* 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter,* 562 U.S. 86, 111–12 (2011) (internal quotation marks and citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed.'" *Rainey v. Varner,* 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland,* 466 U.S. at 697).

This Court finds that the state court's denial of this ineffective assistance of counsel argument was not an unreasonable application of clearly established federal law. Indeed, the state court cited to and applied the applicable *Strickland* standard in determining that counsel's performance did not fall below an objective standard of reasonableness as petitioner had failed to

show calling the two investigators was due to a lack of preparation or a total lack of trial

strategy. As such, petitioner is not entitled to federal habeas relief on this argument.

Within this claim, petitioner also asserts that defense counsel should have objected to

testimony regarding potential molestation of R.H. The Superior Court analyzed this claim as

follows:

> Finally, defendant asserts that T.H. was improperly allowed to
> testify that defendant touched her brother, R.H. Defendant alleges
> that trial counsel failed to object to one specific answer during
> which T.H. was asked how old she was when the touching started
> and stopped. The full colloquy is as follows:
>
>> Q: Okay. So how old were you, do you think, when
>> it started?
>> A: Like, five.
>> Q: Okay. And how old were you when it stopped?
>> A: Ten or eleven.
>> Q: Okay. When it stopped with you?
>> A: Both.
>> Q: Okay. When you say both, what do you mean
>> both?
>> A: Like, all the – me, [L.] and [R.].
>
> [T128-18 to 129-2]
>
> This testimony is the only instance where any touching of R.H.
> was inferred. An objection would certainly have been appropriate,
> however, because all counts of the indictment with respect to R.H.
> were dismissed prior to trial. Nevertheless, this error was not fatal
> because this statement was made at the beginning of T.H.'s
> testimony, and the jury was properly instructed by Judge Smith
> that the charges pertained only to L.H. and T.H. Accordingly,
> defendant cannot succeed on this point.

(Dkt. No. 9-15 at p.29-30)

As described above, the state court determined that counsel's failure to object was not

fatal. This Court finds that this was not an unreasonable application of *Strickland's* prejudice

prong. For example, as the state court noted, the jury was instructed that the charges pertained to

L.H. and T.H. (*See* Dkt. No. 9-37 at p.60-66) The jury is presumed to have followed these instructions that the counts were against L.H. and T.H. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). (citation omitted). As such, petitioner is not entitled to federal habeas relief on this argument.

Petitioner also argues within Claim VII that defense counsel failed to call his biological daughter, A.W. He states that A.W:

> slept in the same room with the girls during the time period they claimed Mr. Butrim sexually assaulted them. In the PCR Petition, the defense indicated that A.W. would have testified that she never saw anything occur between her sisters and her father that was inappropriate. In addition, A.W. would have testified that her sisters had stated numerous times that they wanted Mr. Butrim out of their lives. The testimony of A.W. was essentially that of an eyewitness who contradicted the testimony of the victims. It is unimaginable that defense counsel would have left out this important witness and her crucial testimony.

(Dkt. No. 3 at p. 27) The Appellate Division analyzed this claim as follows:

> [Mr. Butrim] also did not support his petition with a certification from his daughter, A.W., attesting that she would have testified at the trial or what she would have provided. Further, the record does not indicate that calling A.W. as a witness would have been a wise litigation strategy.
>
> In a statement to the police, A.W., who was seven years old at the time, recounted that L.H. told her in some detail the ways in which defendant molested her. Moreover, A.W. told the police that defendant took L.H. into a bedroom several times and closed the door. A.W. also stated to the police that when the twins first made their sexual assault allegations, defendant told her not to talk to anyone about it because he could get arrested. He also told her that everyone in her class at school would laugh at her if the sexual abuse allegations became public. A.W. further stated that defendant beat L.H. with a belt after she made the allegations of sexual abuse. And A.W. told the police that her mother yelled at defendant, telling him "don't do that ever again," and "they will get divorced if this happens one more time." The prosecutor could have cross-examined A.W. about all of those issues.

(Dkt. No. 9-24 at p.25-26)

This Court finds that the state court's denial of this ineffective assistance of counsel claim was not an unreasonable application of *Strickland* nor was the denial based on an unreasonable determination of the facts. As noted by the state court, A.W. told police that L.H. had told her that petitioner had put whipped cream on his private parts. (*See* Dkt. No. 9-8 at p.16) Furthermore, she told police that petitioner told her not to discuss it with anyone. (*See id.* at p.28) She further told the police that petitioner spanked L.H. with a belt. (*See id.* at p.48) A.W. also stated to police that she heard her mom tell her dad that they might get divorced "if this happens one more time." (*Id.* at p.31) Accordingly, as A.W. also possessed such damaging testimony that could be brought against petitioner if she testified, denying this claim was not an unreasonable application of *Strickland*.

Therefore, petitioner is not entitled to federal habeas relief on any of his ineffective assistance of counsel arguments within Claim VII.

## H.  Claim VIII – PCR Court's Failure to Conduct an Evidentiary Hearing

In Claim VIII, Mr. Butrim alleges that he is entitled to federal habeas relief because the PCR Court did not conduct an evidentiary hearing. However, this claim in and of itself does not state a federal claim. "This Court cannot review a state PCR Court's determination under state law of whether to conduct an evidentiary hearing." *Vargas v. Powell*, No. 15-2622, 2016 WL 3298223, at *4 (D.N.J. June 8, 2016) (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *State v. Jones*, 219 N.J. 298, 310-11 (N.J. 2014). Furthermore, the state courts did not unreasonably apply the *Strickland* standard nor deny petitioner's ineffective assistance of counsel claims based upon an unreasonable determination of the facts. Accordingly, petitioner is not entitled to federal habeas relief on Claim VIII.

I.    Claim IX – PCR Court Error in Hearing Mr. Butrim's PCR Petition where it was Barred by Rule 3:2-3

In Claim IX, petitioner asserts that the PCR Court erred in hearing his PCR petition because it should have been declared barred by New Jersey Court Rule 3:22-3. According to petitioner, "the PCR Petition raised issues of Prosecutorial Misconduct, as well as the impermissible introduction of other crimes evidence at trial. These issues were improperly raised at this point in the appellate proceedings and the PCR Court erred in addressing them in its decision." (Dkt. No. 3 at p. 30) New Jersey Court Rule 3:22-3 states as follows:

> Except as otherwise required by the Constitution of New Jersey, a petition pursuant to this rule is the exclusive means of challenging a judgment rendered upon a conviction of a crime. It is not, however, a substitute for appeal from conviction or for a motion incident to the proceedings in the trial court, and may not be filed while such appellate review or motion is pending.

N.J. Ct. R. 3:22-3.

In this claim, petitioner only alleges an error in state law that is not cognizable in these § 2254 habeas proceedings. *See Estelle*, 502 U.S. at 67-69. Therefore, petitioner is not entitled to federal habeas relief on Claim IX. Furthermore, it is worth noting as explained in *infra* Part IV.K, petitioner fails to show that he is entitled to relief because the Appellate Division granted his right to file a direct appeal *nunc pro tunc*. Additionally, as described in *infra* Part IV.O, petitioner is not entitled to federal habeas relief on a claim that PCR counsel was ineffective.

J.    Claim X – Ineffective Assistance of PCR Counsel for filing a PCR Petition rather than a Direct Appeal and Failing to Support Claims in Petition with Affidavits

In Claim X, petitioner asserts that he did not receive effective assistance of PCR counsel because PCR counsel filed a PCR petition before filing a direct appeal and PCR counsel failed to support the claims raised in the PCR petition with affidavits. More specifically, petitioner argues as follows:

> The PCR Counsel improperly filed a petition for PCR prior to filing a direct appeal, as is clearly required by Rule 3:22-3. As a result, Mr. Butrim's claims were prematurely brought before the PCR court, which heard and denied those claims. Counsel's error greatly prejudiced Mr. Butrim in that these issues should have been addressed by the Appellate Division in a Direct Appeal, instead of being summarily dismissed by the lower court.
>
> Additionally, PCR Counsel set forth allegations that trial counsel was ineffective for failing to call A.W. as a witness and for pressuring Mr. Butrim not to testify in his own defense. Yet, these assertions were not supported with affidavits and accordingly denied by the court. Indeed, in its decision, the court states that, "Defendant has not presented certifications or affidavits that suggest that A.W. was amenable to testifying," and that he "points to nothing in the record to support his claim," that he had a strong desire to testify but was strongly advised against it by counsel. PCR counsel's failure to properly support these allegations greatly prejudiced Mr. Butrim in that these issues were not effectively raised and he perhaps will be precluded from raising them again with the necessary supporting evidence.

(Dkt. No. 3 at p.30-31)

Petitioner is not entitled to federal habeas relief on his argument in Claim X that he received ineffective assistance by his PCR counsel as such an argument is meritless. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *see also Poole v. New Jersey*, No. 09-1923, 2010 WL 2952118, at *11 (D.N.J. July 21, 2010) ("Petitioner's claim regarding ineffective assistance of counsel by PCR counsel is not cognizable in a habeas claim.") (citation omitted). Therefore, Claim X will be denied.

K. <u>Claim XI – Counsel's Decision to Forego Direct Appeal Constituted Ineffective Assistance of Counsel</u>

Petitioner argues in Claim XI that the decision of his counsel to file a timely notice of appeal and instead file a PCR petition was prejudicial. He claims that the PCR Court found that

his prosecutorial misconduct claim was barred because it should have been raised on direct review. Furthermore, he claims that counsel's omission to file a direct appeal was prejudicial on his insufficiency of the evidence claim.

Petitioner is not entitled to federal habeas relief on this claim. First, while it is true that the Superior Court determined that petitioner's prosecutorial misconduct claim was barred because it should have been raised on direct appeal, that court also denied the claim on the merits. Thus, petitioner cannot show prejudice because the claim was also analyzed and denied on the merits by the state courts as if it had been raised on direct appeal. Indeed, the Appellate Division ultimately permitted him to file his direct appeal *nunc pro tunc*.

Similarly, petitioner fails to show that he is entitled to relief on his claim that counsel was ineffective for failing to file a direct appeal with respect to his claim of insufficiency of the evidence. As noted above, the Appellate Division granted petitioner's request to file a direct appeal *nunc pro tunc*. Therefore, petitioner fails to show that he is entitled to relief on this claim because the Appellate Division ultimately permitted petitioner to proceed on a direct appeal that included his claim that challenged the evidence against him at trial. Accordingly, petitioner is not entitled to federal habeas relief on Claim XI.

L.  <u>Claim XII – Prosecutorial Misconduct – Eliciting Testimony to Show that Petitioner's Wife Refused to Cooperate with Authorities and Improper Statements during Summation</u>

In Claim XII, petitioner reiterates his claim for prosecutorial misconduct as raised in Claim V. For the reasons discussed *supra* Part IV.E, petitioner is not entitled to federal habeas relief on his prosecutorial misconduct claims. Therefore, Claim XII will also be denied.

M. Claim XIII – Trial Court Erred in Permitting Play Back of L.H. and T.H.'s Direct Testimony Without Playing Back Cross-Examination

In Claim XIII, petitioner argues that it was plain error for the trial court to play back the direct testimony of L.H. and T.H. without playing back their cross-examination. This claim is similar to Claim III which this Court analyzed in *supra* Part IV.C. For the reasons expressed in that section, petitioner is also not entitled to federal habeas relief on Claim XIII.

N. Claim XIV – Ineffective Assistance of Counsel

Petitioner makes several additional ineffective assistance of counsel arguments within Claim XIV. More specifically, he asserts that counsel was ineffective for: (a) failing to appeal the decision to replay only the victim's direct testimony to the jury; (b) failing to challenge the reliability of L.H.'s testimony by failing to question Detective Cranston about L.H.'s inconsistent claim that petitioner ejaculated in her mouth; (c) failing to request a pre-trial hearing to determine the reliability of the testimony of L.H. and T.H.; and (d) failing to object to the prosecutor's remarks during summation.

Petitioner first raised these claims to the New Jersey Superior Court, Appellate Division in a pro se filing appealing his PCR denial. (*See* Dkt. No. 9-20) The Appellate Division denied these claims finding "no merit in any of defendant's PCR arguments." (Dkt. No. 9-24 at p.25) As previously noted, a summary denial is considered a decision on the merits that subjects these claims to AEDPA review. *See Harrington*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.") (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)). As such, to obtain relief on any of these ineffective assistance of counsel arguments, petitioner needs to show that the denial of these claims by the state court was either contrary to or an unreasonable application

of clearly established federal law, or that the denial of these claims was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

     i.     *Failure to Appeal Decision to only Replay Direct Testimony of L.H. and T.H.*

Petitioner's first argument within Claim XIV is that counsel was ineffective in failing to appeal the trial court's decision to only playback the direct testimony of the victims' testimony to the jury. The denial of this argument was not an unreasonable application of the *Strickland* standard. Indeed, as discussed in *supra* Part IV.C, this issue was raised on appeal. Therefore, petitioner fails to show that state court unreasonably applied the *Strickland* standard because counsel did in fact raise this issue on appeal.

     ii.     *Failing to Challenge Reliability of L.H. Testimony*

In petitioner's second argument within Claim XIV, he asserts that his trial counsel never questioned Detective Cranston about L.H.'s description of petitioner ejaculating into her mouth that he testified to during the grand jury proceedings that was different than what L.H. testified to at trial. More specifically, petitioner cites to the following testimony from Cranston that occurred during the grand jury proceedings:

> [L.H.] said she had seen Rob's private, and when she saw it was pointing straight. She said that she has felt something liquidy and gooey come out of Rob's private into her mouth. [L.H.] said she would have to get something to drink if she swallowed it, because it tasted nasty.

(Dkt. No. 9-20 at p.120) However, during her trial testimony, L.H. testified that she never felt anything come out of petitioner's private area (*see* Dkt. No. 9-35 at p.35-36) and that she never had to wipe any liquid off of her. (*See id.* at p. 43) Thus, according to petitioner, trial counsel should have questioned Cranston about L.H.'s purportedly inconsistent statements about whether petitioner ejaculated.

Prior to Cranston's testimony at trial, L.H. testified that petitioner's actions against her only occurred at King's Grant, not at the Buttonwood Apartments. (*See* Dkt. No. 9-35 at p.20, 31-32) Defense counsel got L.H. to reiterate this point when she testified on cross that the first time petitioner touched her inappropriately was at the King's Grant apartments. (*See id.* at p.38) Additionally, during trial, L.H. testified that she did not remember what petitioner's penis looked like. (*See id.* at p.34) Furthermore, during cross-examination, defense counsel asked L.H. where her mom was when these inappropriate touching episodes took place. (*See id.* at p.39) L.H. stated that she was either in the bedroom sleeping or at work. (*See id.*) Defense counsel then pressed L.H. by asking her whether her mother was ever on the computer when the inappropriate touchings and actions occurred to which L.H. testified that she did not remember. (*See id.*)

Petitioner's defense counsel did challenge L.H.'s credibility through his questions to Cranston. Indeed, Cranston was asked about L.H.'s previous statements to him prior to trial that her mom was sometimes home playing on the computer when petitioner molested her. (*See* Dkt. No. 9-36 at p.11) Additionally, Cranston testified that L.H. told him about an incident that occurred at the Buttonwood Apartments where all four children were sleeping in a bed together when petitioner put his penis in her mouth and was moving it around. (*See id.*) Furthermore, defense counsel also questioned Cranston about what L.H. told him about petitioner's penis. Indeed, Cranston testified that L.H. previously told him that she knew it was petitioner who was assaulting her because he penis was shaped weird. (*See id.* at p.12)

Then, during defense counsel's closing argument, he specifically noted the inconsistencies with what L.H. had previously told L.H. to what she was now telling the jury. For example, he noted that L.H. at trial did not remember telling Cranston that these incidents would sometimes occur while her mom was on the computer. (*See* Dkt. No. 9-37 at p.26)

Furthermore, defense counsel noted the inconsistencies with L.H.'s prior statement to Cranston about an incident that had occurred at the Buttonwood Apartments, yet she testified at trial that all of the incidents occurred at King's Grant. (*See id.*) Finally, defense counsel highlighted during closing that L.H. had told Cranston about the shape of petitioner's penis, but at trial said she had never seen his penis. (*See id.*)

As the above citations to the record indicate, defense counsel did make a strong effort to challenge the credibility of L.H. by asking Cranston about L.H.'s previous statements to him before trial that were inconsistent with her trial testimony. It is true that defense counsel did not ask Cranston about L.H.'s previous statement to him about one additional purported inconsistency regarding whether petitioner ejaculated. However, this Court finds that the state court's denial of this claim was not an unreasonable application of *Strickland*. Given counsel's numerous other instances where he challenged L.H.'s credibility through Cranston's testimony, the jury heard numerous purported inconsistencies, yet chose to believe the victims' testimony in finding petitioner guilty. Ultimately, applying the applicable AEDPA deference that is owed to the state courts that denied this claim on the merits, petitioner fails to show that he is entitled to federal habeas relief on this argument.

iii.     *Failure to request pre-trial hearing to determine L.H. and T.H.'s reliability*

Next, petitioner asserts that trial counsel was ineffective for failing to request a pre-trial hearing to determine the reliability of the victims, L.H. and T.H. Petitioner asserts that trial counsel should have requested a pretrial hearing pursuant to New Jersey Rule of Evidence 104(a) and 803(c)(27)(b). According to petitioner, had this hearing been requested and conducted, the deviations in testimony of L.H. and T.H. may have been found out to be the product of improper interviewing techniques. New Jersey Rule of Evidence 104(a) states as follows:

> When the qualification of a person to be a witness, or the admissibility of evidence, or the existence of a privilege is subject to a condition, and the fulfillment of the condition is in issue, that issue is to be determined by the judge. In making that determination the judge shall not apply the rules of evidence except for Rule 403 or a valid claim of privilege. The judge may hear and determine such matters outside the presence or hearing of a jury.

N.J.R.E. 104(a). Additionally, New Jersey Rule of Evidence 803 explains hearsay exceptions not dependent on a declarant's unavailability. More specifically, Rule 803(c)(27) states as follows:

> A statement by a child under the age of 12 relating to sexual misconduct committed with or against that child is admissible in a criminal, juvenile, or civil proceeding if (a) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement at such time as to provide the adverse party with a fair opportunity to prepare and meet it; (b) the court finds, in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse; provided that no child whose statement is to be offered in evidence pursuant to this rule shall be disqualified to be a witness in such proceeding by virtue of the requirements of Rule 601.

N.J.R.E. 803(c)(27).

Petitioner is not entitled to federal habeas relief on this claim. This was not a case in which the prosecution relied on the pretrial statements that L.H. and T.H. made to Cranston during his investigation. Instead, the prosecution's case relied on the actual trial testimony of L.H. and T.H. It was defense counsel who was the *proponent* at trial regarding seeking to get information from Cranston about L.H. and T.H.'s prior statements to him. He did this to ultimately challenge their credibility with their own prior purportedly inconsistent statements to Cranston, not to offer their previous statements as trustworthy. Thus, it was the defense who sought to flesh out the girls' prior statements as a way to impeach their trial testimony. As such,

this Court does not see how defense counsel was ineffective for failing to request a pretrial hearing when the prosecutor was not the one seeking to admit into evidence the girls' prior statements to Cranston during his investigation. Accordingly, petitioner is not entitled to federal habeas on this claim because he has failed to show that the state court's denial amounted to an unreasonable application of clearly established federal law or that the denial was based on an unreasonable determination of the facts.

iv.     *Failing to object during prosecutor's summation*

Petitioner next asserts that trial counsel was ineffective for failing to object during the prosecutor's summation. More specifically, he argues that his trial counsel should have objected when the prosecutor commented during his summation about M.W.B's refusal to cooperate in regard to a consensual intercept request. As noted in *supra* Part IV.E, M.W.B.'s credibility was an issue at trial. Therefore, the prosecutor was permitted to attack the credibility of M.W.B. during trial. Thus, this Court does not find that the state court's denial of this claim on the merits amounted to an unreasonable application of clearly established federal law or that the denial was based on an unreasonable determination of the facts.

It is also worth noting that the jury was specifically instructed during the jury charge that the summations were not evidence. (*See* Dkt. No. 9-37 at p.57) The jury is presumed to have followed the trial court's jury instructions. *See Weeks*, 528 U.S. at 234. Accordingly, for these reasons, this Court finds that petitioner is not entitled to habeas relief on this ineffective assistance of counsel claim as well.

O.  Claim XV - Ineffective Assistance of PCR Counsel

In Claim XV, petitioner argues that PCR counsel was ineffective for failing to obtain an affidavit/certification from A.W. as an eyewitness. Petitioner is not entitled to federal habeas

relief on this claim as he is not entitled to federal habeas relief on a claim that PCR counsel was ineffective. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *see also Poole v. New Jersey*, No. 09-1923, 2010 WL 2952118, at *11 (D.N.J. July 21, 2010) ("Petitioner's claim regarding ineffective assistance of counsel by PCR counsel is not cognizable in a habeas claim.") (citation omitted). Therefore, Claim XV will be denied.

P.  Claim XVI – Actual Innocence

In petitioner's final claim, he asserts that he is actually innocent based upon ineffective assistance of counsel during his trial, appellate and PCR proceedings. While petitioner entitles this claim as actual innocence, petitioner's actual claim appears more akin to reasserting his sufficiency of the evidence claim. Indeed, in his traverse, petitioner appears to clarify what type of claim he is attempting to bring in Claim XVI by expressly citing to *Jackson*, 443 U.S. 307 and *In re Winship*, 397 U.S. 358 to argue that there is "record evidence" that shows that no trier of facts could have found him guilty of his crimes. Having considered petitioner's arguments as to the sufficiency of the evidence as outlined in *supra* Part IV.A, petitioner failed to show that he is entitled to federal habeas relief on a sufficiency of the evidence claim.

Within Claim XVI, petitioner also alludes to a claim he raised in state court that counsel was ineffective when he entered into stipulations on the lack of physical and medical evidence. (*See* Dkt. No. 3 at p.44) The Superior Court analyzed this claim as follows:

> Defendant next argues that the fact that his trial counsel stipulated to the lack of physical and medical evidence constituted ineffective assistance of counsel. Defendant asserts that the stipulations made by his attorney deprived him of the ability to emphasize the fact that his accusers were examined and there were no signs of physical abuse. This argument is without merit.

The stipulations that were entered into by the parties at trial were as follows:

> Stipulation One:  On January 20th of the year 2006, L.H., date of birth March 11, 1995 . . . currently being tried before this jury, was examined by Dr. Marita Lynn (phonetic), a medical doctor and assistant professor of pediatrics at the New Jersey Cares Institute. Dr. Lynn is a pediatrician who specializes in the examination of alleged child abuse victims. At the time of the examination, (L.H.) was four feet, ten inches tall and weighed approximately eighty-four pounds. A complete examination of (L.H.) was conducted by Dr. Lynn, including a gynecological examination, as well as an examination of anal and rectal areas. The gynecological examination refers to an examination of the labia, clitoris, hymen, vagina, and surrounding tissue. Dr. Lynn's comprehensive physical gynecological and anal and rectal examination of (L.H.) did not reveal any physical evidence or indications of trauma or injury indicative of sexual abuse.

> Stipulation Two:  On January 20th of the year 2006, (T.H.) date of birth March 11, 1995 . . . currently being tried before this jury, was examined by Dr. Marita Lynn (phonetic), a medical doctor and assistant professor of pediatrics at the New Jersey Cares Institute. Dr. Lynn is a pediatrician who specializes in the examination of alleged child abuse victims. At the time of the examination, (T.H.) was four feet, ten inches tall and weighed approximately eighty-four pounds. A complete examination of (T.H.) was conducted by Dr. Lynn, including a gynecological examination of the labia, clitoris, hymen, vagina, and surrounding tissue. Dr. Lynn's comprehensive physical gynecological and anal and rectal examination of (T.H.) did not reveal any physical evidence or indications of trauma or injury indicative of sexual abuse.

Defendant's argument that this stipulation prevented him from highlighting the lack of medical evidence to the jury is flawed. His assertion ignores the fact that, had defense counsel presented the

medical experts, the whole of their opinions would have been admitted. If that occurred, defendant could not pick and choose which content the jury would hear. Thus, if defense counsel had called Dr. Lynne, the jury would have heard evidence of L.H.'s entire examination, including the portion in which she gave statements to the doctor about the years of abuse and cleaning up defendant's ejaculate, something she did not mention during her trial testimony. [Pa148 to 153].

Further, the stipulations clearly allowed defense counsel to argue to the jury that the treating doctor did not find any evidence of sexual abuse. At the same time, defendant did not have to take the chance of calling the doctor himself and risk the possibility of the doctor not testifying as clearly at trial as was set forth in the detailed stipulation. A witness on the stand, especially an experienced expert witness, can often times add details or explanations which might undercut aspects of their reports. This uncertainty was avoided by the stipulations. Defense counsel's strategic decision to enter into the stipulations did not constitute ineffective assistance of counsel.

(Dkt. No. 9-15 at p.21-23)

While petitioner raised this as an issue in the Superior Court, it does not appear that he raised this as an issue to the Appellate Division in either his counseled or pro se briefs. Therefore, this claim appears to be unexhausted. *See Jimenez v. Riordan,* No. 14–4349, 2014 WL 4244226, at *2 (D.N.J. Aug.26, 2014) ("The proper procedure for Petitioner is to exhaust his constitutional claims before all three levels of the New Jersey courts and, if he is unsuccessful, to thereafter present them to this Court in a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.") (citing *Moore v. DeYoung,* 515 F.2d 437, 449 (3d Cir.1975)). Nevertheless, this Court would still deny this claim on the merits, *see* 28 U.S.C. § 2254(b)(2), for similar reasons as discussed by the Superior Court. Thus, petitioner would also not be entitled to federal habeas relief on this argument as well. Accordingly, Claim XVI will be denied.

## V.     CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell,* 537 U.S. 322, 327, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). Applying this standard, this Court finds that a certificate of appealability shall not issue in this case.

## VI.     CONCLUSION

For the foregoing reasons, petitioner's habeas petition will be denied and a certificate of appealability shall not issue. An appropriate order will be entered.


DATED:  March 27, 2018                    s/Robert B. Kugler
                                          ROBERT B. KUGLER
                                          United States District Judge